STATE of Maine

v.

Leon F. RICH.

Supreme Judicial Court of Maine.

Dec. 26, 1978.

Charles K. Leadbetter (orally), Stephen L. Diamond, Michael D. Seitzinger, Augusta, William R. Stokes, Asst. Attys. Gen., for plaintiff.

Dunlap, Wood & O'Brien by Mark E. Dunlap, Portland (orally), Glassman & Potter by Caroline D. Glassman, Portland, for defendant.

Before McKUSICK, C. J., and WERNICK, ARCHIBALD, DELAHANTY and NICHOLS, JJ.

NICHOLS, Justice.

Following a jury trial begun on March 14, 1977, in Superior Court in Cumberland County, the Defendant, Leon F. Rich, was found guilty of homicide in the second degree [1] and of burglary while armed with a firearm.[2]

The Defendant brings this appeal from the judgments of conviction entered upon those jury verdicts, raising several points which he deems to be reversible error. He directs his attack in the following areas: (1) denial of a request for recordation of grand jury proceedings; (2) the Superior Court's granting of the State's motion for joinder for trial of the cases against the Defendant and a co-defendant; (3) allowing the recorded testimony of the State's medical examiner to be read to the jury; (4) refusal to allow evidence tending to show the co-defendant's motive for murdering the victim; (5) refusal to allow the Defendant to display his hands to the jury without opening himself to cross-examination; (6) allowing two State witnesses to testify although their names had not been supplied in accord with the court's discovery order; (7) permitting the presentation of certain real and demonstrative evidence to the jury; (8) in-

---

1. 17–A M.R.S.A. § 202 (1976 Supp.), repealed by P.L.1977, c. 510 § 39, effective October 24, 1977 read in pertinent part as follows:

 1. A person is guilty of a criminal homicide in the 2nd degree if:

 A. He causes the death of another intending to cause such death, or knowing that death will almost certainly result from his conduct; or

 B. He intentionally or knowingly causes another to commit suicide by the use of force, duress or deception.

2. 17–A M.R.S.A. § 401 (1976 Supp.)

structions to the jury; (9) sentencing of the Defendant was excessively harsh and was done without first obtaining a recommended sentence from the Maine Department of Corrections.

We deny his appeal.

The facts which the jury was warranted in finding beyond a reasonable doubt may be briefly stated. During the evening of October 5, 1976, the Defendant, along with his co-defendant, Edward Austin, Donald Billingslea and their three girlfriends were "riding around" the Portland area in Austin's automobile and were drinking coffee brandy. Their meanderings led them to the Ann Payson Holt home in Falmouth by approximately 11:30 P.M. The three men got of the automobile and, by breaking a window, entered Mrs. Holt's home. Once inside, the men went to Mrs. Holt's bedroom. It was there that the Defendant shot a pengun, killing Mrs. Holt while she lay in her bed.

The three men then rejoined their girlfriends, taking with them a T.V. set and radio, and left the area. Meanwhile, at Mrs. Holt's home her housekeeper was frantically summoning the police. As Lt. David Kloth, of the Falmouth Police Department, arrived at the scene he saw a full-size sedan leave the Holt home; he noted that the sedan's registration number began with the digits, 6–2–0. Lt. Kloth immediately broadcast this description over the statewide channel from the transmitter in his police cruiser.

Early the next morning, Officer Boyce A. Sanborn, of the South Portland Police Department, observed a vehicle fitting the description of the earlier broadcast. After stopping the vehicle, the six individuals voluntarily went to the South Portland Police Department for questioning. Subsequently the Defendant and Edward Austin were charged with the murder of Mrs. Holt.

I.

The Defendant moved pursuant to M.R. Crim.P. 6(d)[3] for the presence of an official court reporter in order to record the grand jury proceedings. The motion was denied, and the Defendant contends this amounted to an abuse of discretion by the Superior Court.

 In the court's discretion, and upon good cause being shown, the presence of an official court reporter is authorized at a grand jury session. Transcription of the testimony presented to the grand jury is made permissive, not mandatory. The court below expressly concluded that "no sufficient justification" was found. The Defendant's argument that transcripts would be valuable for impeachment purposes at trial could be advanced in the case of every grand jury proceeding and subsequent trial. Moreover, a major policy behind the rule of secrecy is the protection of witnesses from intimidation by assuring their testimony pre-trial secrecy. This policy could have been a strong consideration here because of the threats against certain witnesses which the prosecutor asserted had been made.

There was no abuse of discretion here. *See State v. Levesque*, Me., 281 A.2d 570, 572–574 (1971).

II.

Prior to trial a motion by the State to join for trial the cases of the Defendant and co-defendant Austin was granted. The Defendant now asserts he is entitled to a new trial separate and apart from Austin because each asserted antagonistic or conflicting defenses.

The policy undergirding the joinder of defendants often has been stated as follows:

> Generally speaking where several defendants are jointly indicted they should be

---

**3.** M.R.Crim.P. 6(d) was amended, effective January 3, 1978. Prior to amendment it read:

Attorneys for the state, the witness under examination, interpreters when needed and for the purpose of taking the evidence, in the discretion of the court for good cause shown, an official court reporter may be present while the grand jury is in session; but no person other than the jurors may be present while the grand jury is deliberating or voting.

tried together, particularly where the charges against them arise out of joint acts allegedly committed by each in the presence of each other. In such cases, joint trials are favored in the interest of conserving judicial economy, avoiding duplicitous, time-consuming and expensive trials, conserving public funds, diminishing inconvenience to witnesses and public authorities, and promptly trying those accused of crime. *United States v. Barber*, 442 F.2d 517, 529 (3rd Cir. 1971), *cert. denied*, 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971), cited with approval in *State v. Wing*, Me., 294 A.2d 418, 420 (1972), and *State v. Saucier*, Me., 385 A.2d 44, 46 (1978).

■ The trial court is authorized to order joinder under M.R.Crim.P. 13 and severance under M.R.Crim.P. 14. The court has wide discretion in deciding such matters, and its decision is not grounds for new trial unless prejudice and abuse of discretion are shown. *State v. Saucier, supra*, at 45.

In this case the Defendant expressly objected to joinder on the ground of potential *Bruton* problems.[4] The presiding justice scrupulously avoided any such problems. In fact he warned all parties that if mention were made of a confession by Austin which implicated the Defendant unless or until Austin took the stand, he would declare a mistrial. At no time *during* trial was any motion made pursuant to M.R.Crim.P. 14, asserting prejudicial joinder.

■ Absent any violation of the *Bruton* principles, separate trials were not needed. Here the State called a number of witnesses and offered physical evidence which inculpated the Defendant. The trial was not merely a confrontation between the conflicting testimony of two defendants. Here the court kept a watchful eye over the proceedings to assure that the rights of the Defendant were not prejudiced by joinder. *See State v. Elwell*, Me., 380 A.2d 1016, 1020 (1977).

There was no abuse of discretion here.

## III.

At a bail hearing held prior to trial pursuant to M.R.Crim.P. 46, Charles F. Branch, M.D., the pathologist and medical examiner who performed the autopsy, testified as to his opinion on the cause of death. He was cross-examined by counsel for the Defendant. Subsequently, Dr. Branch suffered serious heart damage and, under his physician's orders, was unable to testify at trial. His earlier testimony at the bail hearing, however, was admitted under the "former testimony" exception to the hearsay rule that, if the declarant is unavailable as a witness, makes admissible.

> Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. M.R.Evid. 804(b)(1).

The Defendant asserts that Dr. Branch was not so "unavailable" as to render the testimony admissible, and he urges that he, the Defendant, did not have sufficient "opportunity" and "motive" to so examine him at the bail hearing as to render his testimony at that hearing admissible at trial.

M.R.Evid. 804(a)(4) provides in pertinent part:

> (a) "Unavailability as a witness" includes situations in which the declarant:
>
> . . . . .
>
> (4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity;

■ Perhaps the ordinary case involving illness of a non-permanent nature should be handled by a continuance of the trial in order to avoid potential danger of violating the constitutional right of con-

4. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

frontation.[5] *See* Advisor's Note to Rule 804(a)(4) and R. Field & P. Murray, *Maine Evidence* § 804.1 (1976); McCormick, *Evidence* § 253 p. 610 (2d ed. 1972).[6] Unavailability, however, does exist where the nature of his physical illness is such that he is not expected to improve and renders the witness unable to testify. *See* 4 J. Weinstein and M. Berger, *Weinstein's Evidence*, 9/804 01, p. 804–39, 40 (1977); *United States v. Bell*, 500 F.2d 1287, 1290 (2d Cir. 1974) (within trial court's discretion to determine that witness was unavailable where she had undergone surgery and would be unable to testify for at least 2½ months); *United States v. Amaya*, 533 F.2d 188, 190–191 (5th Cir. 1976) (within trial court's discretion to find that witness was unavailable when he had suffered injury in an auto accident resulting in loss of memory prior to second trial). In the instant case the record shows that Dr. Branch was an elderly man (having been a pathologist sine 1923), who had suffered heart damage and would be unavailable for an indeterminate period of time. In these circumstances we cannot say the presiding justice abused his discretion in finding Dr. Branch "unavailable."

A second condition to the admission of previously recorded testimony of an unavailable witness is that the party against whom it is offered must have had an opportunity and similar motive to develop the testimony. M.R.Evid. 804(b)(1).[7]

■ This condition was satisfied here. Dr. Branch's testimony at the bail hearing was given under circumstances closely approximating those that surround a typical trial. He was under oath. The Defendant was represented by his attorney, the same attorney who later represented him at trial. The proceedings were conducted before a justice of the Superior Court. The Defendant not only had an opportunity to cross-examine, but in fact, did cross-examine at some length. *Cf. California v. Green*, 399 U.S. 149, 154–165, 90 S.Ct. 1930, 26 L.Ed.2d 489, 494–501 (1970).[8] The Defendant's right of confrontation was not violated.

There was no abuse of discretion here.

### IV.

During the trial there was testimony that upon entering her bedroom, Austin had a conversation with Mrs. Holt. The Defendant asserts that Mrs. Holt could have later identified Austin, and he argues that it was error to deny him the opportunity during the presentation of his defense, to show that Austin's possible motive for murdering Mrs. Holt was to conceal his parole violation.[9]

The threshold question is whether the Defendant could adduce that testimony from a probation and parole officer after foregoing the opportunity to do so when Austin himself was on the stand. The Defendant had cross-examined Austin at length prior to presenting his own case. At that time the Defendant had ample opportunity to elicit evidence of Austin's parole status, so that he might use it later for argument purposes. He later sought to prove that status through the testimony of a probation and parole officer.

Evidence of Austin's prior convictions would have indicated to the jury his special motive of concealment in view of the heavi-

5. Me.Const. art. 1, § 6; U.S.Const. Amend. VI.

6. *See also Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968).

7. M.R.Evid. 804(b)(1) provides in pertinent part as follows:
 The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
 ". . . (T)estimony given as a witness at another hearing of the same or a different proceeding . . . if the party against whom the testimony is now offered . . . had an opportunity and similar motive to

develop the testimony by . . . cross . . . examination."

8. The reference in the rule to a "similar motive to develop the testimony" is a departure from identity of issue. R. Field & P. Murray, *Maine Evidence*, § 804.2 (1976). *See also* 5 Wigmore, *Evidence* § 1388 Chadbourne rev. 1974; McCormick, *Evidence*, § 257 (2d ed. E. Cleary ed. 1972); 70 A.L.R.2d 494 (1960).

9. At the time of the crime Austin was on parole from the Maine State Prison.

er penalties for multiple offenders. As such its probative value was weak. Moreover, the risk of unfair prejudice to Austin by interjecting this evidence was considerable. It would also consume more time in what was already a long trial.

■ It was within the discretion of the presiding justice to exclude the proffered evidence on the basis of undue delay and waste of time. M.R.Evid. 403.

### V.

When the Defendant was stopped by the police several hours after the crime, a police officer noticed a burn mark on his hand between his thumb and forefinger. He explained to the police he had burned himself a day or two earlier while working on an automobile engine. At trial the State introduced evidence which tended to show that the burn could have been a powder burn caused by flashback from the Defendant's pengun. The Defendant proposed to display his hand to the jury. The State objected and the court sustained the objection. Now on appeal he argues for the first time that displaying his hand would have revealed a scar whose location would tend to prove that it could not have come from flashback.

■ M.R.Evid. 103(a)(2) provides that error may not be predicated on a ruling excluding evidence unless a substantial right of the party is affected, and unless the substance of the evidence is made known to the court by offer of proof or was apparent from the context within which the question was asked. *See* R. Field & P. Murray, *Maine Evidence* § 103.4 (1976). No

offer of proof was made here.[10] At no time did the Defendant call the presiding justice's attention to the probative value of the display. Such a statement was essential, not only for the presiding justice to rule advisedly, but to present a basis for this Court, on appeal, to determine whether his ruling was erroneous. *See Utz v. Utz*, Me., 273 A.2d 303, 304 (1971). There being no such basis, the Defendant's point is without merit.

### VI.

Pursuant to M.R.Crim.P. 16(a) the Defendant made a motion for extensive discovery which requested, *inter alia*, "names and present addresses of all persons to be called by the State as witnesses in the trial of this case." This part of the motion was granted by the Superior Court, with a proviso that the State's duty was ongoing and that information was to be furnished "so that the Defendant may be afforded ample time to review such information prior to the trial of this case." The Superior Court later modified the order by requiring the State to list only its "potential" witnesses. The Defendant now claims an error in what he asserts was non-compliance by the State with the discovery order in the case of two witnesses.

■ To constitute an abuse of discretion the record before us must demonstrate that the Defendant was unfairly surprised or prejudiced by the omission of the two names from the list. *State v. Tullo*, Me., 366 A.2d 843, 849–850 (1976); *State v. LeClair*, Me., 382 A.2d 30, 33 (1978).

---

**10.** On this point the record contains only the following colloquy:

DEFENSE ATTORNEY: Your Honor, I'm sorry I didn't bring this up before when we were in Chambers, but it's my intention before I call Mr. Jordan to have Mr. Rich demonstrate to the jury—to show them his hands. There has been a considerable testimony brought by the State here as to the time that his hands were examined by the Officers who stopped him in South Portland that there was a blister on his hands, and this has been characterized by one of the State's witnesses as a second degree burn. It was testified as

to, although the Officers didn't know which hand it was, it was considerable testimony and the implication was and they kept pointing to a certain area of his hand. The implication between the thumb and forefinger. The implication had been that he had received this from a firearm, and it's my intention simply to show his hands to the jury.
THE COURT: Do you object?
ASSISTANT ATTORNEY GENERAL: Yes, your Honor.
THE COURT: I'll sustain the objection.
(End of Bench Conference.)

■ The record discloses that while both individuals were omitted from the State's initial list, the Defendant's counsel was made aware of their probable appearances at least seven days prior to their being called.[11] This was ample time to prepare for their appearances. When they were called as witnesses, both were thoroughly cross-examined by the Defendant. There is no evidence in the record that indicates unfair surprise or prejudice. The presiding justice did not abuse his discretion in ruling on the admissibility of this testimony.

### VII.

The Defendant claims that the demonstrative use of a pengun before the jury was prejudicial because of its inflammatory nature.

There was evidence indicating that the Defendant owned and carried a .22 caliber pengun on October 5, 1976, and that he killed Mrs. Holt with it. Additionally, there was evidence that the Defendant threw the pengun into the water off Custom House Wharf, in Portland, shortly after the crime took place. The pengun used as the State's exhibit was similar to the Defendant's weapon.

■ The presiding justice found that there existed sufficient evidence to suggest the use of a pengun in the crime and that it was properly usable by the State Police detective as a demonstration model. He gave the jury a special instruction as to its limited use. The exhibition to the jury of this weapon, of a type largely unknown to the general public and unique in its physical makeup, aided in explaining to the jury its construction and use. The brief demonstration does not appear to have been so preju-

dicial as to outweigh the probative value of helping the jury understand how a pengun works. M.R.Evid. 403.

The Defendant further argues that there was insufficient foundation to support the admission into evidence of two .22 caliber bullets, one recovered from a tire and the other from the harbor bottom near Custom House Wharf.

The State asserts that the bullet recovered from a tire taken from a parked car was fired from the Defendant's pengun several hours before the Holt murder. The State asserts the bullet recovered near Custom House Wharf was a product of the pengun the Defendant deposited there. The evidence was admitted by the presiding justice "subject to whatever probative value the jury feels it's worth."

■ There was sufficient evidence that these bullets were in fact fired from the pengun of the Defendant.[12] M.R.Evid. 901(a).

There was no error here.

### VIII.

The Defendant next claims that the charge to the jury was erroneous and that consequently his conviction must be reversed.

During his charge relative to the culpable state of mind the presiding justice defined "knowingly" as follows:

A person acts knowingly with respect to a result of his conduct when he is aware that it is practically certain that his conduct will cause such a result. This may be shown by the character of the fatal act and the surrounding circumstances. Where there is proof, no fact or circumstance indicating that the accused acted

11. The Defendant was aware that Officer Sanborn and Billingslea would be probably called to testify because of their involvement in the investigation on the night of October 5 and early morning hours of October 6.

12. There was testimony from the Defendant's companions that he had that night shot a hole in the tire of a parked car on Washington Avenue, in Portland. Coupled with the testimony of the owner of the car from which the tire and bullet were taken, the evidence supports the State's claim. The bullet at Custom House Wharf was recovered from an area also pointed out to police by the Defendant's companions who saw him discard his weapon there. The foundation was sufficiently laid in order to allow a reasonable juror to find this evidence to be relevant. See 5 J. Weinstein & M. Berger, *Weinstein's Evidence* par. 901(a)(02) (1977).

with a sedate and deliberate mind, yet where the fatal act was unlawful and voluntarily committed without adequate provocation and under circumstances showing an indifference to human life or with a total disregard of the consequences, this is an act knowingly done. The Defendant takes the position that this instruction was erroneous and prejudicial.

The first sentence of this instruction is an accurate reflection of the definition of "knowingly" as provided by 17-A M.R.S.A. § 10(2)(A). Although the second sentence of the instruction is an incorrect statement, the jury was correctly informed as to the definition of "knowingly."

 The correctness of a charge is not to be determined from mere isolated statements extracted from it, without reference to their connection with what precedes, as well as that which follows. The whole charge must be read to determine whether there was prejudicial error. *State v. Small*, Me., 267 A.2d 912, 917 (1970).

 The Defendant next objects to the jury instructions on the further grounds that the presiding justice failed to explain to the jury the meaning of "unlawful killing." The court instructed as follows:

Was the deceased a living person on or before October 6th, 1976? Was she killed unlawfully? What does this mean? It means that to sustain a conviction, proof of a criminal agency is as indispensible (*sic*) as proof of the victim's death, and *it must affirmatively appear that the death was not accidental due to natural causes, due to the deceased's own act and was not excusable or justifiable.*

Furthermore, the record reflects six instances during the charge where the court noted that the killing must be found by the jury to have been "without justification or excuse." The charge on this point was more favorable than the Defendant had a right to expect. See *State v. Gagnon*, Me., 383 A.2d 25, 31 (1978).

 The Defendant goes on to claim that the court erred when instructing the jury with respect to the crime of theft.[13] The court stated:

To commit theft means to obtain the property of another with the intent to permanently deprive that other person of the property; the property being personal property.

The charge failed to mention "unauthorized control" as specified in the statute. The evidence was sufficient for the jury to find that following the shooting of Mrs. Holt the Defendant, along with Austin and Billingslea, left the scene of the shooting taking Mrs. Holt's radio and T.V. No reasonable jury could find an authorized taking on those facts. Therefore, the omission constituted harmless error. *Cf. Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *State v. McKeough*, Me., 300 A.2d 755, 757–761 (1973).

 The Defendant next claims an error in the instructions given the jury concerning criminal homicide in the first degree upon the sole basis that there was no evidence of pecuniary benefit to him. 17-A M.R.S.A. § 201(2)(E).[14] The jury, however, acquitted the Defendant of criminal homicide in the first degree. Moreover, there was credible evidence upon which the jury could have found a pecuniary benefit to the Defendant.

---

**13.** 17-A M.R.S.A. § 353 states in pertinent part:

Theft by unauthorized taking or transfer
1. A person is guilty of theft if he obtains or exercises unauthorized control over the property of another with intent to deprive him thereof.
2. As used in this section, "exercises unauthorized control" includes but is not necessarily limited to conduct heretofore defined or known as common law larceny by trespassory taking, larceny by conversion, larceny by bailee and embezzlement.

**14.** 17-A M.R.S.A. § 201(2)(E) (1976 Supp.) repealed and replaced by P.L. 1977, c. 510, § 38, eff. October 24, 1977, read in relevant part as follows:

A person is guilty of criminal homicide in the first degree if he commits criminal homicide in the 2nd degree as defined in section 202 and, at the time of his actions . . . (t)he criminal homicide was (in fact) committed for pecuniary benefit . . . .

■ Next the Defendant claims an error because in the course of his jury instructions, the presiding justice explained the mandate of 15 M.R.S.A. § 1315 as follows: [15]

> It is the law of this State that the failure of a person accused of a crime to testify shall not be construed or commented upon as an indication of his guilt. Therefore, the fact that the defendant did not testify shall not be construed by you as an indication that he is guilty of any crime charged. Just like every defendant in this State he is presumed innocent until proved guilty beyond a reasonable doubt; and this burden always rests on the State and never shifts to the Defendant.

The Defendant contends that by stating that the jury should not consider his "failure" to testify, the court implied that he had a duty to testify. This point is without merit. *State v. White*, Me., 285 A.2d 832, 836 (1972). *See also Lakeside v. Oregon*, 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978).

■ The Defendant's final objection to the charge is grounded in the presiding justice's failure to give several of his proposed instructions. Even if all the proposed instructions were a proper articulation of the law, the presiding justice was under no obligation to give them since the instructions he gave were legally correct and adequately covered the essential points. *Isaacson v. Husson College*, Me., 332 A.2d 757, 762 (1975); *State v. Palumbo*, Me., 327 A.2d 613, 616 (1974).

There was no prejudicial error in the instructions to the jury.

### IX.

The Defendant was sentenced to serve concurrent prison terms of fifty years for second degree homicide and twenty years for burglary. He now argues that the former sentence is excessively harsh in view of the twenty-five year minimum sentence applicable to first degree homicide. Further he asserts the sentences were illegal in that no recommended sentence was included in the written pre-sentence report as required.

■ To be cognizable on direct appeal the "jurisdictional" sentencing infirmity must appear on the face of the appeal record so plainly that its existence is shown as a matter of law. That is to say that the relevant facts must appear on the record on appeal so plainly as to preclude rational disagreement as to their existence; only then would the facts be shown as a matter of law. The sentence must be established on the face of the appeal to be beyond the statutory powers of the sentencing justice. *State v. Parker*, Me., 372 A.2d 570, 572 (1977).

■ The Defendant's contentions with respect to the supposed failure of the Department of Mental Health and Corrections to include a recommended sentence in its report evaluating Defendant [16] fails to survive under the above standard. The jurisdictional infirmity in the sentencing procedure does not appear in the record on appeal so plainly as to preclude rational disagreement as to its existence.

Rather, the record contains evidence that the Department, through a probation and parole officer, made an oral recommendation of sentence. Such an oral statement of a recommended sentence would satisfy the terms of the statute. The presiding justice's failure to recall the statement of the recommended sentence does not do more than create a fact issue insufficient to provide the jurisdictional underpinnings for review of the sentence upon appeal.

---

**15.** 15 M.R.S.A. § 1315 reads as follows:

> In all criminal trials, the accused shall, at his own request but not otherwise, be a competent witness. He shall not be compelled to testify on cross-examination to facts that would convict, or furnish evidence to convict him of any other crime than that for which he is on trial. *The fact that he does not testify in his own behalf shall not be taken as evidence of his guilt.* The husband or wife of the accused is a competent witness except in regard to marital communications. (emphasis supplied).

**16.** See 17–A M.R.S.A. § 1251.2.

The excessive harshness of the sentence which the Defendant claims, on the other hand, is an issue of law which does not require the resolution of any factual questions. The Defendant's sentence for second degree homicide to a term of fifty years is consistent with the provisions of 17–A M.R.S.A. § 1251.3.[17] The argument of the Defendant is that this fifty year sentence is illegal since 17–A M.R.S.A. § 1254.2[18] permits a petition for reduction of a life sentence, mandated for first degree homicide, after twenty-five years, but a petition for reduction of Defendant's sentence for second degree homicide would be permitted only after forty years. The Defendant asserts this result is anomalous and could not have been the intention of the legislature. The Defendant is wrong. Neither logic nor the legislative history support the view that the legislature intended to limit the Superior Court to imposing sentences of less than thirty-one years which would allow a petition for reduction at less than twenty-five years.

In the case of second-degree homicide the purpose of the rule requiring that four-fifths of the sentence be served before a petition for reduction is permitted, is to assure definiteness and certainty in the sentencing process. This proportional rule was required by the discretion the legislature vested in the Superior Court so that the judiciary might fit the punishment to the crime. By contrast, the fixed penalty of life imprisonment for first degree murder left the legislature no alternative but to set a specific minimum period to precede the petition for reduction.

Where a definite term was to be fixed by the court, the legislature provided a different rule; this rule contributes to the fairness and definiteness of the sentencing system by requiring that a fixed proportion of the sentence be served by all prior to the petition for reduction. The basic rule requiring service of four-fifths of the sentence does not conflict with the twenty-five year provision; the latter was the response to the special case of a life sentence where no proportional rule could be applied.

The legislative history of this provision does not aid Defendant's argument. The act was in no way intended to impinge upon the sentencing discretion of the court. Its sponsor, Rep. James K. McMahon, declared that the bill only "insures that anyone convicted for these two offenses [first and second degree homicide] will serve a minimum sentence before being able to petition the court for a review, reduction and possible elimination of their sentences." Legislative Record—House, June 10, 1975, p. B1781. Later the sponsor added that, "The amendment does not do anything other than what it says it does, there are no hidden intentions behind it." *Id.*

The discretion vested in the Superior Court in fixing sentences for second degree homicide necessitated a proportional rule to assure fairness and definiteness in the actual period of incarceration served.

17. 17–A M.R.S.A. § 1251.3 reads:
Upon receipt of the report and recommendations provided for in subsection 2, the court shall sentence him to the State Prison for any term of years that is not less than 20.

18. 17–A M.R.S.A. § 1254.2 reads:
A person sentenced to life imprisonment may, after having served 25 years, and annually thereafter, and a person sentenced to a term of 20 years or more, may, after having served ⅘ of said sentence, and annually thereafter, petition the Superior Court of the county in which he is imprisoned for a reduction of his sentence to a term of years. Upon notice to the Attorney General and the victim or the next of kin of the victim, the court shall hold a hearing on the petition and may, in its discretion, reduce the sentence from life imprisonment to a term of years that is not less than 30, and reduce any other sentence to a term that is not less than 20. If the sentence is so reduced the imprisoned person shall be unconditionally released and discharged upon the expiration of the term specified in such sentence, minus such deductions authorized under section 1253 as he shall have accumulated; provided, however, that notwithstanding any deductions that may be accumulated under section 1253, no such person shall be so released and discharged until he has served 25 years, if his sentence is life imprisonment or ⅘ of his sentence, if that sentence is for a term of years of 20 years or more.

By contrast, there is no discretion with respect to first degree homicide—life imprisonment is mandated. Since the punishment was the same for all, a fixed minimum period of incarceration prior to petition for reduction could appropriately be fixed. These differences in the sentencing rules relating to first and second degree homicide are reasonably calculated to carry out the legislative purposes of providing fairness and certainty in the fixing and service of sentences for these crimes. The sentence imposed cannot be said to be overly harsh in view of the circumstances of this crime, and it is not otherwise in contravention of the law.

The entry must be:

Appeal denied.

Judgments affirmed.

POMEROY and GODFREY, JJ., did not sit.